# In the United States Court of Appeals for the Eighth Circuit

Iowa Safe Schools, f/k/a GLBT Youth in Iowa Schools Task Force, *et al.*,

*Plaintiffs-Appellees*,

v.

Kim Reynolds, in her official capacity as
Governor of the State of Iowa, *et al.*,

*Defendants-Appellants*,

Matt Degner, in his official capacity as Iowa City Community School District
Superintendent, *et al.*,

*Defendants*.

On Appeal from the United States District Court for the Southern District of
Iowa, No. 4:23-cv-474, Honorable Stephen H. Locher, District Judge

## BRIEF FOR PLAINTIFFS-APPELLEES

Thomas D. Story
American Civil Liberties Union
of Iowa Foundation
505 Fifth Avenue, Suite 808
Des Moines, IA 50309
(515) 243-3988
thomas.story@aclu-ia.org

Camilla B. Taylor
Lambda Legal Defense and
Education Fund, Inc.
3656 N. Halsted Street
Chicago, IL 60613
(312) 663-4413
ctaylor@lambdalegal.org

Laura J. Edelstein
Jenner & Block LLP
455 Market Street, Suite 2100
San Francisco, CA 94105
(628) 267-6800
ledelstein@jenner.com

*Counsel for Plaintiffs-Appellants*

(Additional counsel listed on
signature block)

## SUMMARY OF THE CASE AND STATEMENT ON ORAL ARGUMENT

The State of Iowa passed Senate File 496 to limit discourse about sex, gender identity, and sexual orientation.

Plaintiffs-Appellees are public school students, teachers, and a non-profit organization representing students and student groups across Iowa. On remand and consistent with this Court's prior decision, the district court, after exhausting canons of construction, entered a partial injunction. The district court limited enforcement of the ban on "instruction" relating to "gender theory" to compulsory curriculum, finding the law's reach into extracurricular student organizations and other activities exceeded the State's authority and was either a viewpoint-based restriction on student expression or was void for vagueness. The district court limited enforcement of the reporting obligation to student requests to be referred to by a pronoun different from school records, finding the obligation to report any gender-affirming "accommodation" void for vagueness. Based on its thorough analysis of the restriction on library books for overbreadth in a related case heard together with this one, the district court enjoined enforcement of that provision.

This case presents constitutional issues of public importance and warrants oral argument. Plaintiffs request 15 minutes.

Appellate Case: 25-2186    Page: 2    Date Filed: 09/05/2025 Entry ID: 5554970

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, Plaintiff-Appellee Iowa Safe Schools, f/k/a GLBT Youth in Iowa Schools Task Force states that it has no parent corporation and that no publicly held corporation owns more than ten percent of its stock.

Dated September 4, 2025                    Respectfully submitted,

                                           */s/ Thomas D. Story*
                                           Thomas D. Story
                                           AMERICAN CIVIL LIBERTIES UNION
                                           OF IOWA FOUNDATION
                                           505 Fifth Avenue, Suite 808
                                           Des Moines, IA 50309
                                           (515) 243-3988
                                           thomas.story@aclu-ia.org

iii

# TABLE OF CONTENTS

**Page(s)**

SUMMARY OF THE CASE AND STATEMENT ON ORAL ARGUMENT....... ii

CORPORATE DISCLOSURE STATEMENT ...................................................... iii

TABLE OF CONTENTS.................................................................................... iv

TABLE OF AUTHORITIES ............................................................................. vi

STATEMENT OF ISSUES ..................................................................................1

INTRODUCTION ...............................................................................................3

STATEMENT OF THE CASE.............................................................................5

    A.    Statutory Provisions and Background..........................................5

        1.  Parental Notice Section .............................................................6

        2.  Instruction Section .....................................................................8

        3.  Library Restriction ...................................................................10

    B.    Procedural History.....................................................................12

        1.  The District Court's First Preliminary Injunction and Eighth Circuit Remand.............................................................................................12

        2.  The District Court's Second Preliminary Injunction ...................13

SUMMARY OF ARGUMENT ...........................................................................15

STANDARD OF REVIEW ................................................................................17

ARGUMENT .....................................................................................................18

I.    THE DISTRICT COURT'S PARTIAL INJUNCTION OF THE NOTIFICATION REQUIREMENT SHOULD BE AFFIRMED...........................18

    A.    The Parental Notice Section's Undefined Use of "Accommodation" is Vague.............................................................................................18

    B.    The District Court Interpreted the Parental Notice Section as Narrowly as Possible.........................................................................................24

II.    THE DISTRICT COURT'S PARTIAL INJUNCTION OF THE INSTRUCTION SECTION SHOULD BE AFFIRMED. ......................................25

iv

A. Prohibiting School Districts from Providing Any Program or Promotion Relating to Gender Identity and Sexual Orientation is Facially Unconstitutional Under *NetChoice*. ....................................................................25

   1. "Program" and "Promotion" Apply to Voluntary Portions of School........26

   2. Restrictions on "Programs" and "Promotion" Are Facially Unconstitutional Under First Amendment....................................................................32

   3. Unconstitutional Applications of the Instruction Section Outweigh any Constitutional Applications................................................................35

B. The District Court Properly Enjoined the Unconstitutional Sections of the Instruction Section Consistent with the State's Position that the Instruction Section Applies Only to Mandatory Curriculum. ................................36

C. *Walls v. Sanders* is Inapposite..................................................38

III. THE PRELIMINARY INJUNCTION AGAINST THE LIBRARY RESTRICTION IN *PENGUIN RANDOM HOUSE v. ROBBINS* DOES NOT RENDER PLAINTIFFS-APPELLEES' REQUEST FOR A PRELIMINARY INJUNCTION MOOT. ....................................................................39

IV. THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR PLAINTIFFS-APPELLEES. .......................................................43

A. The District Court Correctly Found That Plaintiffs-Appellees Face Irreparable Harm....................................................................43

B. The Balance of Equities and Public Interest Favor Plaintiffs-Appellees...43

CONCLUSION....................................................................45

CERTIFICATE OF COMPLIANCE....................................................47

CERTIFICATE OF SERVICE ........................................................48

v

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Am. Dog Owners Ass'n v. City of Des Moines*,
  469 N.W.2d 416 (Iowa 1991)..............................................................................24

*Batalla Vidal v. Nielsen*,
  279 F. Supp. 3d 401 (E.D.N.Y. 2018), vac'd in part and rev'd in part on other
  grounds, Dep't Homeland Security v. Regents of Univ. of Cal., 591 U.S. 1
  (2020)......................................................................................................................40

*Bose Corp. v. Consumers Union of United States, Inc.*,
  466 U.S. 485 (1984) ..............................................................................................18

*Brakke v. Iowa Dep't of Nat. Res.*,
  897 N.W.2d 522 (Iowa 2017)................................................................................33

*Cajune v. Indep. Sch. Dist. 194*,
  105 F.4th 1070 (8th Cir. 2024)........................................................................1, 33

*California v. Health and Human Services*,
  390 F. Supp. 3d 1061 (N.D. Cal. 2019)................................................................39

*Coates v. City of Cincinnati*,
  402 U.S. 611 (1971) ..............................................................................................19

*D.M. ex rel. Bao Xiong v. Minnesota State High Sch. League*,
  917 F.3d 994 (8th Cir. 2019)............................................................................2, 44

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
  640 F.2d 109 (8th Cir. 1981) ................................................................................17

*Davis v. Anthony, Inc.*,
  886 F.3d 674 (8th. Cir. 2018) ...............................................................................18

*Doe v. State*,
  943 N.W.2d 608 (Iowa 2020).......................................................................... 27, 28

*Doe v. Trump*,
  142 F.4th 109 (1st Cir. 2025) ...............................................................................45

Appellate Case: 25-2186     Page: 6     Date Filed: 09/05/2025 Entry ID: 5554970

*Elrod v. Burns*,
427 U.S. 347 (1976) ............................................................43

*Farkas v. Miller*,
151 F.3d 900 (8th Cir. 1998) ..................................... 19, 21

*Federal Trade Comm'n v. Neiswonger*,
580 F.3d 769 (8th Cir. 2009) ...........................................43

*GLBT Youth in Iowa Schools Task Force v. Reynolds*,
114 F.4th 660 (8th Cir. 2024) .............................. 12, 13, 42

*Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*,
559 U.S. 280 (2010) ............................................................29

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ............................................................18

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988) ............................................................42

*Hill v. Colorado*,
530 U.S. 703 (2000) ............................................................19

*Imperial Sovereign Ct. v. Knudsen*,
699 F. Supp. 3d 1018 (D. Mont. 2023) ..........................33

*Iowa Migrant Movement for Justice v. Bird*,
*2025 WL 319926 (8th Cir. Jan. 24, 2025)*, vac'd, reh'g en banc granted, 2025
*WL 11*40762 (8th Cir. Apr.15, 2025) ................................41

Cf. Jackson Fed'n of Teachers v. Fitch,
2025 WL 2394037,  (S.D. Miss. Aug. 18, 2025) .................44

*Johnson v. United States*,
576 U.S. 591 (2015) ............................................................19

*Mall Real Est., L.L.C. v. City of Hamburg*,
818 N.W.2d 190 (Iowa 2012).............................................29

*Maytag Corp. v. Int'l Union, United Auto., Aerospace & Agric. Workers*
*Implement Worke*rs of Am.,
No. 4:08-CV-00291-JEG, 2011 WL 3682787 (S.D. Iowa July 22, 2011)...........42

Appellate Case: 25-2186     Page: 7     Date Filed: 09/05/2025 Entry ID: 5554970

*McKinney ex rel. NLRB v. S. Bakeries, LLC*,
786 F.3d 1119 (8th Cir. 2015) ...............................................................18

*Moody v. NetChoice, LLC*,
603 U.S. 707, 144 S. Ct. 2383 (2024) ........................................ passim

*MPAY Inc. v. Erie C*,
*ustom Comput. Applications, Inc.*, 970 F.3d 1010 (8th Cir. 2020) ....................17

*Myers v. City of Cedar Falls*,
8 N.W.3d 171 (Iowa 2024)...............................................................27

*NetChoice*.............................................................................................37

*Nw. Immigrant Rights Project v. United States Citizenship and Immigration Servs.*,
496 F. Supp. 3d 31 (D.D.C. 2020)...............................................................40

*Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*,
83 F.4th 658 (8th Cir. 2023) ........................................ passim

Penguin Random House v. Robbins,
774 F. Supp. 3d 1001 (S.D. Iowa 2025)........................................ passim

*Penguin Random House, LLC, et al*, *v. Robbins*, No. 25-1819 (8th Cir. Aug. 1,
2025) ...............................................................................................11

*Penn. Dep't of Corr. v. Yeskey*,
524 U.S. 206 (1998) ...............................................................27

*Powell v. Noble*,
798 F.3d 690 (8th Cir. 2015) ...............................................................2, 43

*Rep. Comm. for Freedom of the Press v. Rokita*,
— F.4th —, 2025 WL 2218472........................................45

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*,
826 F.3d 1030 (8th Cir. 2016) ...............................................................18

*Rodgers v. Bryant*,
942 F.3d 451 (8th Cir. 2019) ...............................................................18

*Selcuk v. Pate*,
2024 WL 5054961 (S.D. Iowa Nov. 3, 2024) ........................................15

viii

*St. Paul Fire & Marine Ins. Co. v. Compaq Comput. Corp.*,
539 F.3d 809 (8th Cir. 2008) ...............................................................32

*State v. Shorter*,
945 N.W.2d 1 (Iowa 2020) ...................................................................30

*Stephenson v. Davenport Cmty. Sch. Dist.*,
110 F.3d 1303 (8th Cir. 1997) .............................................................43

*Trump v. CASA, Inc.*,
606 U.S. —, 145 S. Ct. 2540 (2025) ....................................................44

United Food and Commercial Workers Int'l Union v. IBP, Inc., 857 F.2d 422 (8th Cir. 1988),
857 F.2d 422 (8th Cir. 1988) ...........................................................1, 30

*United States v. Barraza*,
576 F.3d 798 (8th Cir. 2009) ...............................................................18

*United States v. Iowa*,
737 F. Supp. 3d 725 (S.D. Iowa 2024) .................................................15

*United States v. Texas*,
144 F.4th 632 (5th Cir. 2025) ..............................................................45

*Viewpoint Neutrality Now! v. Bd. of Regents of Univ. of Minn.*,
109 F.4th 1033 (8th Cir. 2024) ............................................................32

*Volokh v. James*,
— F.4th —, 2025 WL 2177513 n.12 (2d Cir. Aug. 1, 2025)..............45

*Walls v. Sanders*,
144 F.4th 995 (8th Cir. 2025) ........................................................ 32, 38

*Welty v. Dunaway*,
No. 2:24-CV-768, 2025 WL 2015454 (M.D. Tenn. July 18, 2025) ...................44

*Whitman-Walker Clinic, Inc. v. United States Dep't of Health and Human Servs.*,
485 F. Supp. 3d 1 (D.D.C. 2020).....................................................2, 40

**Statutes**

Iowa Code section 261I.2(1)(*a*)–(*b*) ........................................................33

Appellate Case: 25-2186    Page: 9    Date Filed: 09/05/2025 Entry ID: 5554970

Iowa Code § 4.12 ........................................................................... 24, 37

Iowa Code § (19)(a)(2) .........................................................................11

Iowa Code § 256.11 ....................................................................... 2, 10, 11

Iowa Code § 256.146(13) ......................................................................19

Iowa Code § 279.66(1)..........................................................................28

Iowa Code § 279.68(2)(*a*).....................................................................27

Iowa Code § 279.78 .................................................................... passim

Iowa Code § 279.80 .................................................................... passim

Iowa Code § 280.3(1)..........................................................................27

Iowa Code § 280.6 ...............................................................................11

SF418, https://www.legis.iowa.gov/legislation/BillBook?ga=91&ba=SF418 passim

## Regulations

Iowa Admin. Code r. 281–12.2.............................................................12

## Other Authorities

*Accommodation*, Merriam-Webster Dictionary https://www.merriam-webster.com/dictionary/accommodation (last visited Sept. 2, 2025) .................20

Anthony Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 166 (2012), https://jm919846758.wordpress.com/wp-content/uploads/2020/09/rlilt.pdf .......................................................................28

Human Rights Campaign, *Growing Up LGBT in America: Key Findings* (2018), https://tinyurl.com/mvzmmr7k.................................................................6

*Promotion*, Merriam-Webster Dictionary https://www.merriam-webster.com/dictionary/accommodation (last visited Sept. 2, 2025) .................28

Samantha Hernandez et al., Iowa book ban's toll: 3,400 pulled books, including '1984' and 'To Kill a Mockingbird', Des Moines Register (updated June 7, 2024), https://tinyurl.com/42uxhndn).................................................................11

Appellate Case: 25-2186     Page: 10     Date Filed: 09/05/2025 Entry ID: 5554970

# STATEMENT OF ISSUES

1. Was the district court within its discretion in determining that Plaintiffs are likely to succeed on their claim that an Iowa law mandating schools to report to parents any "accommodation" requested by a student "intended to affirm gender identity" is, except for the statutory example of the use of pronouns different from a school's registration forms or records, void-for-vagueness?

  **Case**: *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658 (8th Cir. 2023)

**Statute**: Iowa Code § 279.78(3)

2. Was the district court within its discretion in determining that Plaintiffs are likely to succeed on their claim that the Instruction Section is a viewpoint-based restriction on student speech or, alternatively, is void-for-vagueness, after applying canons of statutory interpretation and attempting to discern a narrow construction of the law that would render it constitutional, but concluding those provisions are incapable of narrowing construction?

 **Cases**: *Moody v. NetChoice, LLC*, 603 U.S. 707, 144 S. Ct. 2383 (2024)

  *United Food and Commercial Workers Int'l Union v. IBP, Inc.*, 857 F.2d 422 (8th Cir. 1988)

  *Cajune v. Indep. Sch. Dist. 194*, 105 F.4th 1070 (8th Cir. 2024)

  *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658 (8th Cir. 2023)

 **Statute**: Iowa Code § 279.80

1

3.      Was the district court within its discretion in determining that Plaintiffs are likely to succeed on their claim that the Library Restriction violates the First Amendment for the same reasons the district court found the plaintiffs in the related case *Penguin Random House LLC v. Robbins* were likely to succeed on a substantially similar challenge?

> **Cases**: *Penguin Random House v. Robbins*, 774 F. Supp. 3d 1001 (S.D. Iowa 2025)
>
> *Whitman-Walker Clinic, Inc. v. United States Dep't of Health and Human Servs.*, 485 F. Supp. 3d 1 (D.D.C. 2020)

**Statute**: Iowa Code § 256.11

4.      Was the district court within its discretion in determining that the Plaintiffs demonstrated a sufficient threat of irreparable harm, including violations of the Student and Educator Plaintiffs' constitutional rights, and that the balance of equities and public interest tip in Plaintiffs' favor?

> **Cases**: *Powell v. Noble*, 798 F.3d 690 (8th Cir. 2015)
>
> *D.M. ex rel. Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994 (8th Cir. 2019)

2

## INTRODUCTION

The district court entered a narrow, and partial, preliminary injunction to provide some clarity to a vague law, while preserving the State's authority, for now, to enforce large parts of the law. The State has failed to provide a valid basis to reverse the preliminary injunction. It should be affirmed.

In the prior appeal and on remand, the State urged an interpretation of the Instruction Section that would be viewpoint-neutral and limited to mandatory curricular matters. The district court entered a preliminary injunction that allows the State to enforce the Instruction Section in this way. The State similarly argued for a narrow interpretation of the Parental Notice Section requiring parental or guardian notification only when a student's request for a gender-affirming accommodation is clearly intended and understood. Again, the preliminary injunction allows this enforcement, as well. Yet, the State appeals to this Court again, though it cannot say what exactly the partial injunction prohibits it from doing—because to do so would be to admit the law's unconstitutionality.

Rather than adopt an atextual interpretation that defies the Iowa Legislature's intent and lacks any support in the factual record, the district court has preserved, for now, those provisions of the law that allow the State to mandate the exclusion of "gender theory" and "sexual orientation" from the K-6 classroom curriculum and allow the State to impose a requirement that students requesting pronouns different

3

from their school registration forms be reported to their parents or guardians. The district court, however, prohibited the State from engaging in viewpoint-based discrimination of student groups or expression outside of the classroom, and from threatening teachers with discipline for failing to report on every student who is perceived to deviate from subjective expectations of gendered behavior. The State nonetheless seeks reversal solely to expand its authority and prolong the uncertainty surrounding the law.

The district court's preliminary injunction should be affirmed. First, an obligation to report any student who requests a gender-affirming "accommodation" is vague, outside of the only given example of pronouns, and fails to give educators notice of who exactly they must report and when. Second, a ban on any school-provided "program" or "promotion" relating to gender identity or sexual orientation is an unconstitutional viewpoint-based restriction on speech; the only reasonable interpretation is that it targets only certain types of gender identity (or, post-amendment, certain views on gender) and certain sexual orientations. The State does not possess the authority to engage in such discrimination, and certainly not outside of curricular matters. An alternative viewpoint-neutral interpretation also would not save this provision, as educators would be left with an unconstitutionally vague term subjecting them to discipline. Third, the district court appropriately granted relief from the Library Restriction consistent with its decision in a related case, and the

4

district court appropriately incorporated its prior well-reasoned analysis by reference following a consolidated hearing with that case. Finally, the irreparable harm absent an injunction is unrebutted, and the balance of the equities plain in an injunction's favor.

## STATEMENT OF THE CASE

### A.    Statutory Provisions and Background

Enacted in May 2023, SF496, which the State refers to as "education reform," has little to do with curriculum, and much more to do with identity. The law contains three provisions relevant to this appeal: (1) the Parental Notice Section[1]; (2) the Instruction Section[2]; and (3) the Library Restriction.

---

[1] The district court referred to this provision as the "Gender Identity Notification Provision." This shorthand is more accurate than the State's term "Parental Notice," as the term "Parental Notice" fails to take into account that notification must also be given to guardians, is mandatory, and is required only in the context of gender identity. Iowa Code § 279.78(3). Nevertheless, to ease the burden of the shifting names for these provisions, Plaintiffs will use the State's term, although they object to the characterization.

[2] The district court referred to this provision as the "Gender Identity/Sexual Orientation Restriction." Again, the court's term is more accurate than the State's term "Instruction Section" because the restriction applies to contexts *other than* "instruction." However, the term "Gender Identity/Sexual Orientation Restriction" is now outdated as Iowa has replaced "gender identity" with "gender theory." *See* SF418, § 28, https://www.legis.iowa.gov/legislation/BillBook?ga=91&ba=SF418. Plaintiffs will use the "Instruction Section" shorthand encouraged by the State, rather than their prior reference to the "Don't Say LGBTQ+" provision to avoid confusion.

### 1. Parental Notice Section

The Parental Notice Section subjects educators to State investigation and discipline if they fail to "report" to a student's "parent or guardian" if a student "requests an accommodation that is intended to affirm the student's gender identity . . . including a request that the licensed practitioner address the student using a name or pronoun that is different than the name or pronoun assigned to the student in the school district's registration forms or records." Iowa Code § 279.78(3); *id.* § 279.78(4)(*a*)–(*b*) (requiring investigation into any violation and authorizing the imposition of disciplinary action). This provision sowed fear and distrust in a student body already vulnerable to abuse. *See* App. 178, R.Doc. 115-1 at 14, n. 3.

The uncertainty around the "triggering event" for notification meant students experiencing bullying, sexual harassment or assault, or mental health crises related to their gender identity were discouraged from accessing vital, even life-saving support from school counselors, social workers, or other school employees otherwise able to assist them, as requesting such services could be construed as an "accommodation." App. 117, R.Doc. 115-13, ¶¶ 28-29; App. 178, R.Doc. 115-1 at 14, n. 4 ("A 2018 survey of LGBT youth listed (1) non-accepting families, (2) school/bullying problems, and (3) fear of being out or open about their identity as the top three problems they face. Human Rights Campaign, *Growing Up LGBT in America: Key Findings* (2018), p. 9, https://tinyurl.com/mvzmmr7k. Many school

6

districts clamped down on student groups formed for LGBTQ+ students and allies, often called Gender Sexuality Alliances, or "GSAs," fearing that participation in such groups, or knowledge of students' gender-affirming expression in such groups, could also be "accommodations." *See* App. 55-56, R.Doc. 115-7, ¶ 23; App. 98, R.Doc. 115-12, ¶¶ 10-11; App. 116, R.Doc. 115-13, ¶ 28; App. 126-130, R.Doc. 115-14, ¶¶ 17-25. This meant students in these groups encountered restrictions no other student-led organization at their school faced, including permission-slip requirements and the withdrawal of faculty advisor support. *Id*. ¶ 18. Students, such as those in non-affirming homes or those who simply were not prepared to discuss identity with their parents, felt they had no choice but to self-censor. *See* App. 29, R.Doc. 115-4, ¶ 12; App. 57, R.Doc. 115-7, ¶¶ 28-29; App. 64, R.Doc. 115-8, ¶ 10; App. 76, R.Doc. 115-9, ¶ 28; *see also* App. 176, R.Doc. 115-1 at 12. Meanwhile, teachers, who were provided only one example of a reportable circumstance—pronouns—faced the risk that their licenses will be taken on an arbitrary and discriminatory basis, including for sponsoring a GSA. *See* App. 92, R.Doc. 115-11, ¶¶ 28-29; App. 99-100, R.Doc. 115-12, ¶ 15; App. 102-04, R.Doc. 115-12, ¶¶ 31, 36-37. They further feared their moral obligation to support a student in need would one day place them in direct violation of the law. *See* App. 76-77, R.Doc. 115-9, ¶ 30; App. 91, R.Doc. 115-11, ¶ 24; App. 102-103, R.Doc. 115-12, ¶¶ 31, 36.

## 2. Instruction Section

As enacted, the Instruction Section prohibited all school districts from "provid[ing] any program, curriculum, test, survey, questionnaire, promotion, or instruction relating to gender identity or sexual orientation" in grades K-6. Iowa Code § 279.80(2). The resulting confusion over what constituted a "program" or "promotion," let alone the distinguishing characteristics between "curriculum, test, survey, questionnaire . . . or instruction," or what might "relate to" gender identity or sexual orientation, had severe consequences. However, one thing was clear: the State had only certain sexual orientations and gender identities in mind for this restriction.

School districts told educators to remove and refrain from anything that may be perceived as related to LGBTQ+ people, rights, or issues, in any environment accessible to a K-6 student. *See, e.g.*, Add. 8, App. 534, R.Doc. 141 at 8 ("For example, the superintendent of Urbandale School District sent an email 'ordering the removal of all LGBTQ+ visual representations (pride flags, safe space stickers, etc.) from all schools, including high schools, given the potential for a student in grades kindergarten through six to see these symbols during a community event."). GSAs were "shut down altogether" or "prohibited or discouraged from hanging signs or otherwise engaging in promotion." *Id*. at 8. One plaintiff teacher was instructed not to mention his husband in the presence of students, (App. 89, R.Doc.

8

115-11, ¶ 12), while teachers throughout Iowa feared discipline should they recommend a book with an LGBTQ+ character or intervene in anti-LGBTQ+ bullying. App. 73-74, R.Doc. 115-9, ¶ 16; App. 90-91, R.Doc. 115-11, ¶ 21; App. 100-02, R.Doc. 115-12, ¶¶ 22-30. LGBTQ+ students found themselves targeted and without support. App. 41, R.Doc. 115-6, ¶ 14 ("SF 496 allowed for A.G. to become a victim of anti-LGBTQ bullying for the first time during their time at Jackson Elementary. . . . SF 496 essentially forced A.G. to not only defend their identity, but also to explain the concept of gender identity to a group of fifth graders with no prior understanding of the topic, all without any backup from the adult in the room."); App. 142, R.Doc. 115-15, ¶ 12 ("This removal of symbols meant to encourage LGBTQ+ inclusion sends a message to the school's LGBTQ+ students, faculty, and staff, that they are invisible at best, and unwelcome at worst."); App. 150, R.Doc. 115-16, ¶ 10 ("Since the law was passed, except for the time the preliminary injunction was in effect, A.C. has been unsure of what is safe and legal to say and so have been her educators, creating a climate of distrust, worry, and fear that is not conducive to A.C.'s education or wellbeing."). Raising the stakes, the Section's location in accreditation requirements means the penalty for violation could effectively close the school.

Since its original enactment, but after the hearing on the Plaintiffs' Renewed Motion for Preliminary Injunction, the Iowa Legislature amended the Instruction

9

Section to replace "gender identity" with a new term: "gender theory." *See* SF418, § 28. The new term is defined as "the concept that an individual may properly be described in terms of an internal sense of gender that is incongruent with the individual's sex as either male or female," including "the concept that an individual who experiences distress or discomfort with the individual's sex should identify as and live consistent with the individual's internal sense of gender." *Id.* Although all parties agree the injunction is unaffected by this change, Brief of Defendants-Appellants "Appellants' Br." p. 5 n.1, the amendment confirms the Instruction Section applies to transgender or nonbinary identities, but not cisgender identities. The Instruction Section now expressly prohibits the "concept" of these identities, while authorizing the "concept" of gender as synonymous with "the state of being either male or female as observed or clinically verified at birth." SF418, § 4.1A(1)(*a*),(*e*) (defining "sex" as defining "gender" as "a synonym for sex" and not intending "gender identity, experienced gender, gender expression, or gender role"). Expression and student groups that recognize a diversity in gender are and always have been the main target.

### 3.    Library Restriction

The Library Restriction required all schools, regardless of grade level, to exclude from their libraries any book or other material if it contains a "description[] or visual depiction[] of a sex act," as defined in Iowa's criminal code. Iowa Code §

10

256.11(9)(*a*)(2). Carve-outs from the ban were made for human growth and development curriculum and religious materials. *Id.* §§ 256.11(9)(*a*)(2), (19)(*a*)(2); *id.* § 280.6. Schools were not otherwise allowed to consider things such as the work as a whole, its educational value, or the age of the reader. The Library Restriction quickly led to the removal of thousands of books. *See* App. 177, R.Doc. 115-1 at 13, n. 2 ("The Des Moines Register maintains an expanding list based on school districts' responses to open records requests, one of the few methods of tracking this information as SF496 does not require schools to report their removal of materials. Samantha Hernandez et al., Iowa book ban's toll: 3,400 pulled books, including '1984' and 'To Kill a Mockingbird', Des Moines Register (updated June 7, 2024), https://tinyurl.com/42uxhndn). Among them were Pulitzer Prize winners, books regularly on Advanced Placement exams, and books designed to help teenagers understand and avoid being victimized by sexual assault. App. 180, R.Doc. 115-1 at 16. Consistent with the national trend, (*See* Brief of PEN American Center, Inc. As Amicus Curiae Supporting Plaintiffs-Appellees at 4, *Penguin Random House, LLC, et al*, *v. Robbins*, No. 25-1819 (8th Cir. Aug. 1, 2025) ("Since 2021, state efforts to ban books in public school libraries have proliferated.")), and the context and statements made by the Iowa Legislature and Governor around passage, (*See,* App. 235-236, 241-242, R.Doc. 121, ¶¶ 109-110, 113-115, ¶ 130), books with LGBTQ+ themes were particularly likely to be targeted and removed. App. 12-13, R.Doc. 115-

11

2, ¶¶ 12-13; App. 17-18, R.Doc. 115-3, ¶¶ 4-8; App. 36, R.Doc. 115-5, ¶¶ 7-9. Students who saw themselves or their experiences reflected in these books were stigmatized, (App. 11-13, R.Doc. 115-2, ¶ 5; App. 36, R.Doc. 115-5, ¶ 7; App. 84, R.Doc. 115-10, ¶13), students simply wanting to read the books could not, (App. 12-13, R.Doc. 115-2, ¶ 14; App. 18, R.Doc. 115-3, ¶¶ 7-8; App. 36, R.Doc. 115-5, ¶ 8), and educators feared discipline should they include a book that crossed the line from "reference or mention" to "description," App. 76, R.Doc. 115-9, ¶ 27; *see also* Iowa Admin. Code r. 281–12.2.

## B.    Procedural History

### 1.    The District Court's First Preliminary Injunction and Eighth Circuit Remand

The district court issued a partial preliminary injunction on December 23, 2023, enjoining Defendants from enforcing the Library Restriction and the Instruction Section. *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 666 (8th Cir. 2024). The State appealed. On appeal, this Court held that Plaintiffs had standing to pursue their claims on all relevant challenged provisions. *Id.* at 668-69. The Court also rejected the State's assertion that the "government speech" doctrine precluded Plaintiffs from asserting First Amendment rights. *Id.* at 667-68.

The Court remanded the case back to the district court, however, for additional examination of the standards set forth in *NetChoice, LLC*, 144 S. Ct. 2383, a

12

Supreme Court opinion released after the district court had issued its opinion and after the parties had briefed the appeal in this case. *GLBT Youth in Iowa Schools,* 114 F.4th at 670 ("The district court did not perform the necessary inquiry set forth in *NetChoice*").[3] The Court additionally instructed the district court to examine and exhaust the "the canons of constitutional-avoidance, *noscitur a sociis*, and Iowa's admonition to interpret its laws reasonably and in a manner feasible of execution" in search of a narrower meaning, "before concluding the only textual interpretation is an absurd one." *GLBT Youth in Iowa Schools Task Force*, 114 F4th at 670-71.

The Court did not find that the district court "should" read SF496 one way or another. *See* Appellants' Br. at 19. Rather, it assessed the interpretative methods the district court used in the first order granting preliminary injunction as incomplete. The remand order was a narrow one—to further consider the canons of statutory construction and the impact of *NetChoice* on the facial challenge to the law.

### 2. The District Court's Second Preliminary Injunction

On remand, the district court did exactly as instructed. In the related case of *Penguin Random House LLC v. Robbins,* the district court enjoined the restriction

---

[3] *NetChoice* requires courts examining facial challenges on the basis of overbreadth to "assess the laws' scope," then "determine which of the laws' applications violate the First Amendment" and then "measure the unconstitutional applications against the remaining provisions." *GLBT Youth in Iowa Schools,* 114 F.4th at 670-71 (citing *NetChoice*, 144 S. Ct. at 2398).

on school library materials after a thorough analysis under *NetChoice*.[4] The district court incorporated this analysis by reference into its order in this case. *See* Add. 14, App. 540, R.Doc. 141 at 14. The district court further conducted thorough examinations of the rest of the law under *NetChoice* and utilized the canons of construction as the Court ordered. Add. 17-22, 24-27, App. 543–48, 550–53, R.Doc. 141 at 17-22, 24-27 (analyzing the Instruction Section by its plain text, and under the constitutional avoidance, noscitur a sociis, and title-and-headings canons); Add. 32-33, App. 558–59, R.Doc. 141 at 32-33 (analyzing the plain text of the Parental Notice Section and finding it partially void for vagueness).

Now on its second appeal, the State appears to argue that the district court committed the same errors that caused the Court to order a remand. However, an objective reading of the district court's order shows that the "Eighth Circuit's criticism [was] well-taken" and the district court extensively explored "alternative interpretations" of the Instruction Section and further analyzed the law under *NetChoice.* Add. 15, App. 541, R.Doc. 141 at 15. These more detailed analyses *did* narrow the injunction's scope and *did* preserve large parts of the law. *Id.* Having

---

[4] *See Penguin Random House LLC v. Robbins*, No. 4:23-cv-00478-SHL-SBJ, 2025 WL 1156545 (S.D. Iowa Mar. 25, 2025).

Appellate Case: 25-2186   Page: 24   Date Filed: 09/05/2025 Entry ID: 5554970

conducted that further analysis, the district court found parts of the law still failed

constitutional muster, while narrowing its injunction.[5]

## SUMMARY OF ARGUMENT

The district court acted within its discretion in finding the obligation, on

threat of discipline, to report students who request an undefined "accommodation"

intended to affirm gender identity was void for vagueness, except in the form of

the only example given in the statute of a request to be referred to by a pronoun

differing from that on school records, and entering a tailored injunction

accordingly. There is no plausible construction of the broader obligation that

would provide educators with constitutionally adequate notice of the conduct

prohibited. The district court acted appropriately and severed the language that

would render the statute unconstitutional, thus allowing enforcement of the portion

of the statute that it found was not vague.

---

[5] This result was not, as the State characterizes, a "federal judicial veto." Appellants' Br. at 8. This attack on the independence and credibility of the federal judiciary, and an Honorable Judge of the United States District Court for the Southern District of Iowa in particular, is inappropriate. Each challenge is brought on its own merits, treated accordingly, and a considered and carefully drawn ruling is issued. The State's accusation, taken from a cherry-picked sample of recent litigation surrounding two Iowa statutes (SF496, *see Penguin Random House LLC v. Robbins*, 774 F. Supp. 3d 1001 (S.D. Iowa 2025), and SF2340, *see United States v. Iowa*, 737 F. Supp. 3d 725 (S.D. Iowa 2024)), is baseless and fails to account for cases in which the State prevailed in early defense of its actions, such as *Selcuk v. Pate*, 2024 WL 5054961 (S.D. Iowa Nov. 3, 2024). It must be rejected and disregarded.

The district court acted within its discretion in enjoining the prohibition on "programs" and "promotions" that "relate to" gender identity or sexual orientation. The terms "program" and "promotion," in context, and after exhausting all relevant canons of statutory interpretation, may refer to extracurricular or other activities outside of mandatory curriculum. The prohibition on such activities, including the voluntary organization and activities of GSAs, is unconstitutionally viewpoint-based, in that it operates to prohibit only speech relating to LGBTQ+ identity. The district court, by limiting its injunction to the prohibition on "programs" and "promotions," exercised proper judicial restraint to leave the remainder—and the whole of the statute as interpreted by the State, which contends it is all limited to mandatory curriculum—in force.

The district court acted within its discretion in, following a consolidated hearing on motions for preliminary injunction in two cases seeking overlapping injunctive relief on a provision of Iowa law requiring the removal of thousands of library books without any pedagogical basis, entering injunctive relief in Plaintiffs' favor for those same reasons the court had thoroughly laid out in the order issued in the related case. Overlapping injunctions are common, and, as shown by the State's appeal of the preliminary injunction in the related case, a necessary feature of parallel litigation. Moreover, the district court is under no obligation to restate

16

its prior analysis in full, particularly under these circumstances, where the legal analysis warranting the relief is identical.

The district court acted within its discretion in finding Plaintiffs met their burden of showing irreparable harm absent a preliminary injunction and that the balance of the equities favored a preliminary injunction. Having shown a likelihood of success on their constitutional claims, Plaintiffs unquestionably showed irreparable injury, and it is always in the public interest to prevent the violation of constitutional rights. The status quo at the time of the preliminary injunction was not, as the State contends, one of understood enforcement of the challenged law, but one of confusion and uncertainty as to the future status of a law that had made substantial changes to the ways in which Iowa public schools had operated before enactment and had already been once enjoined.

## STANDARD OF REVIEW

Plaintiffs seeking a preliminary injunction must establish four factors: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981); *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1015 (8th Cir. 2020). Although "'no single factor is determinative,' the probability of success factor is the most significant." *MPAY Inc*, 970 F.3d at 1015;

17

*accord Rodgers v. Bryant*, 942 F.3d 451, 456 (8th Cir. 2019). Likelihood of success need only be shown as to any one of multiple claims. *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016).

This Court reviews the district court's factual findings for clear error, its legal conclusions *de novo*, and the ultimate decision to grant a preliminary injunction for abuse of discretion. *McKinney ex rel. NLRB v. S. Bakeries, LLC*, 786 F.3d 1119, 1122 (8th Cir. 2015). In cases raising First Amendment issues, this Court may independently examine the whole record. *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499 (1984). "Questions of mootness" are reviewed *de novo*. *Davis v. Anthony, Inc.*, 886 F.3d 674, 677 (8th. Cir. 2018).

## ARGUMENT

### I. THE DISTRICT COURT'S PARTIAL INJUNCTION OF THE NOTIFICATION REQUIREMENT SHOULD BE AFFIRMED.

#### A. The Parental Notice Section's Undefined Use of "Accommodation" is Vague.

A statute "is unconstitutionally vague if it fails to 'provide adequate notice of the proscribed conduct' and lends 'itself to arbitrary enforcement,'" where officials "are left to decide on an 'ad hoc and subjective basis'" what is permissible and what is not. *Parents Defending Educ.*, 83 F.4th at 668-69 (quoting *United States v. Barraza*, 576 F.3d 798, 806 (8th Cir. 2009); *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972)). To pass constitutional muster, "a statute must (1) be clear enough to provide a person of ordinary intelligence with notice of what conduct is

18

prohibited, and (2) provide standards for those who enforce the prohibitions." *Farkas v. Miller*, 151 F.3d 900, 905 (8th Cir. 1998) (citation omitted); *Hill v. Colorado*, 530 U.S. 703, 732 (2000). The severity of the threat of enforcement against the Teacher Plaintiffs—including the loss of professional licensure that could effectively end their careers—demands greater scrutiny of the Parental Notice Section's language. *See* Iowa Code § 279.78(4); *see also* Iowa Code §§ 256.146(13), 279.27(1)-(2). Facial challenges to vague laws are appropriate where, as here, the "ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all," meaning people "of common intelligence must necessarily guess at its meaning." *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971). This is true even if the challenged provision offers the requisite clarity in some applications. *See Johnson v. United States*, 576 U.S. 591, 602 (2015) (noting that the Supreme Court's holdings "squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp.").

The State asserts that the "plain text of the law . . . gives clear guidance" as to what types of "accommodations" requested by students would require school officials to notify their parents. Appellants' Br. at 29. Far from it. The Parental Notice Section mandates that licensed practitioners report a student's request for an

19

"accommodation" without providing a constitutionally sufficient explanation of what an "accommodation" means. The statute does not define the word. *See* Iowa Code § 279.78. The dictionary does not help, as "accommodation" can mean "the providing of what is needed or desired for convenience," but also "adaption, adjustment" and "a reconciliation of differences." *See Accommodation*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/accommodation (last visited Sept. 2, 2025). Complicating the analysis is that to trigger the Parental Notice Section, the requested accommodation must be "intended to affirm the student's gender identity"—thereby requiring educators to somehow discern the student's intent. *See* Iowa Code § 279.78. This opens the door to "any number of judgment calls"—that is, decisions made on an "ad hoc and subjective basis"—as to what constitutes a reportable request for an accommodation, as the district court correctly found. Add. 32-33, App. 558–59, R.Doc. 141 at 32-33; *see also Parents Defending Educ.*, 83 F.4th at 669.

The State makes much of one of the district court's examples—a student named "Harriet" who asks to be called "Harry"—asserting that "context matters" and that educators will know if students have taken other steps to affirm their gender identities, such as changing their physical appearance, engaging in undescribed "other conduct," or making "other statements" so as to trigger the reporting requirement. Appellants' Br. at 26-27. This assumes that (1) a student has taken any

20

of those actions; (2) those actions were intended to affirm the student's gender identity; and (3) the educator knows about those actions. Harriet may have gotten a short haircut around the same time she asked to be called Harry, but neither action was intended to affirm her gender identity. Or perhaps Harry did intend for these actions to affirm their gender identity, but the educator does not know about the haircut or is unaware of Harry's intent. If "context matters," then educators will be forced to interrogate every "Samantha" who wishes to be called "Sam" to learn why or otherwise risk discipline, including losing their professional licensure. And what if an educator undertakes this significant, subjective investigation, but the student— out of fear—hides their intent, insisting that "Sam" is a request for a nickname unrelated to their gender identity? If the educator takes the student at their word and does not report this request for an accommodation, can the educator still face discipline? Not only does the Parental Notice Section fail to provide educators with the constitutionally-requisite notice, it fails to provide those tasked with enforcing the provision with clear guidance as to when they must do so. *See Farkas*, 151 F.3d at 905 ("[A] statute must (1) be clear enough to provide a person of ordinary intelligence with notice of what conduct is prohibited, and (2) provide standards for those who enforce the prohibitions."); *see also Parents Defending Educ.*, 83 F.4th at 669 ("The lack of clarity also makes the policy susceptible to arbitrary enforcement.").

The provision is hopelessly vague as to what types of requests for other "accommodations" are a trigger. Educators do not know, for example, whether they are required to report if a student confides in the teacher that they have been binding their chest. *See* App. 99-100, 103, R.Doc. 115-12, ¶¶ 16-18, 36. Nor do they know "what speech during a GSA meeting could trigger a report home." App. 57. R.Doc. 115-7, ¶ 29. Although the State asserts that "mere attendance" at a GSA meeting is not enough to trigger the reporting requirement, the declarations of students and faculty members establish otherwise, *id.*, and school districts have required parental permission to participate. *Id.* ¶ 23; App. 115-16, 117, 119, R.Doc. 115-13, ¶¶ 24, 28, 34; App. 134, R.Doc. 115-14, ¶ 36. It is the context and content of a GSA meeting that raises concerns; GSA meetings provide vital support and safe spaces for LGBTQ+ youth, where "they can be themselves without fear of judgment or harm." App. 51, R.Doc. 115-7, ¶ 13; App. 111, R.Doc. 115-13, ¶ 11. This can manifest in myriad ways: students using their preferred names or pronouns, describing their experiences as LGBTQ+ students, or discussing issues affecting LGBTQ+ people. At what point does a student's expression of these topics "cross the line"? No wonder teachers are reluctant after the law to sponsor these groups, and no wonder some school districts have instructed faculty advisors to stay out of the room during a group meeting. App. 118, R.Doc. 115-13, ¶ 30; App. 129, R.Doc. 115-14, ¶ 23.

22

Further, although educators may understand what an "accommodation" means in other contexts—for example, "an action or service required by a students' individualized education plan . . . such as paraeducator support or an augmentative and alternative communication device"—those applications do not make sense in the context of gender identity and the Parental Notice Section. App. 92, R.Doc. 115-11, ¶ 25. The inapplicability of the term "accommodation" to *this* context is what makes it so confusing, and this confusion directly rebuts the State's unsubstantiated argument that "[l]icensed practitioners already understand and apply the concept of accommodations in a variety of contexts." Appellants' Br. at 27.

The district court's comparison of the word "accommodation" in the Parental Notice Section with the Eighth Circuit's analysis of the word "respect" in *Parents Defending Education* is precisely on point. There, the challenged policy did not define what it meant to "respect" gender identity, just as SF496 does not define what it means to "accommodate" gender identity. *See Parents Defending Educ.,* 83 F.4th at 668. Gender identity is a complex subject, and like the word "respect," "accommodation" "has various meanings." *See id*. And because the challenged policy did not "define or limit the term," this Court determined "it could cover *any speech* about gender identity that a school administrator deems 'disrespectful' of another student's gender identity"—not just a refusal to use a student's preferred names and pronouns—leaving students uncertain as to what speech may trigger

23

discipline. *Id*. at 668-69. SF496's Parental Notice Section similarly sweeps far beyond requests to use preferred names and pronouns. It could plausibly cover *any actions* that are deemed accommodations "to affirm [a] student's gender identity," leaving educators uncertain as to what they must report and when they might be disciplined. *See* Iowa Code § 279.78(3). As a result, the Parental Notice Section is subject to the same "unpredictable interpretations" the Court found constitutionally problematic in *Parents Defending Education*, opening the door for arbitrary enforcement as officials are left to determine on an "ad hoc and subjective basis" when reports are required and when they are not. *See* 83 F.4th at 669. The Court's reasoning underlying its finding of vagueness in *Parents Defending Education* leads to the same conclusion here.

**B.     The District Court Interpreted the Parental Notice Section as Narrowly as Possible.**

The State also argues that the district court abused its direction by "jumping to a void-for-vagueness ruling" because the Parental Notice Section can instead be narrowed. Appellants' Br. at 25. The State ignores that the district court *did* narrow the provision by way of severability. *See Am. Dog Owners Ass'n v. City of Des Moines*, 469 N.W.2d 416, 418 (Iowa 1991) ("When parts of a statute or ordinance are constitutionally valid, but other discrete and identifiable parts are infirm, we may sever the offending portions from the enactment and leave the remainder intact."); *see also* Iowa Code § 4.12. Rather than enjoin the totality of the provision as

24

unconstitutionally vague, the district court spared the portion it determined was "clear enough to provide fair notice to educators and other school officials about what is expected:" a student's request to be addressed using a pronoun different from that in school records. Add. 33, App. 559, R.Doc. 141 at 33.

The State repeatedly asserts that the Parental Notice Section is subject to a narrowing construction, but does not explain what that narrow reading is. It does not point to other statutory language that allows "accommodation" to be read narrowly. Instead, the State asserts "context is king" and educators will be able to ascertain reportable requests for "accommodations" if students change their physical appearances or engage in other unidentified "conduct" that may or may not signal their intent to affirm their gender identity. *See* Appellants' Br. at 24. Far from *narrowing* the Parental Notice Section, the State effectively *expands* the provision so that *any* request from a student could be construed as a request for an "accommodation" triggering a report home—and prompt disciplinary action for educators if they do not report it.

## II. THE DISTRICT COURT'S PARTIAL INJUNCTION OF THE INSTRUCTION SECTION SHOULD BE AFFIRMED.

### A. Prohibiting School Districts from Providing Any Program or Promotion Relating to Gender Identity and Sexual Orientation is Facially Unconstitutional Under *NetChoice*.

The district court correctly enjoined Iowa Code § 279.80(2)'s prohibition on any "program" or "promotion" relating to gender identity and sexual orientation. Far

25

from abusing its discretion, the district court properly followed this Court's instruction to exhaust canons of construction and apply the framework set out in *NetChoice*. The process left no option but to conclude that the restriction, in part, is facially unconstitutional. First, the district court used canons of construction to conclude the Instruction Section's restrictions on programs and promotion must be interpreted as reaching non-curricular spaces and expression. Second, the State, which did not and does not defend the statute's application outside of mandatory curriculum, cannot challenge the district court's conclusion such restrictions are viewpoint-based or void-for-vagueness. Third, as these restrictions are unconstitutional in all their applications, the district court properly determined they outweighed any potential constitutional applications. Finally, the district court exercised judicial restraint and enjoined only those portions of the statute clearly exceeding the State's authority, while allowing the State to continue to enforce the restrictions on curriculum, tests, surveys, questionnaires, and instruction. The State's appellate brief does not meaningfully grapple with this analysis and in several respects ignores or mischaracterizes it. The injunction should be affirmed.

### 1. "Program" and "Promotion" Apply to Voluntary Portions of School.

The district court exhausted all relevant canons of construction and correctly concluded that "program" and "promotion" cannot be interpreted to refer to only mandatory portions of the educational curriculum. Add. 16, App. 542, R.Doc. 141

26

at 16. The State fails to demonstrate how the district court applied the canons of statutory construction incorrectly. Rather, the State repeats its original statutory interpretation arguments and ignores the district court's careful analysis responding to those arguments.

Based on the statutory text, the plain meaning of "program" and "promotion," as used in the Instruction Section, does not inherently relate to compulsory activities. Add. 16, App. 542, R.Doc. 141 at 17-19. Rather, the plain meaning interpretation of "program" and "promotion" covers *both* compulsory and voluntary activities. *Id.* Not only are those terms ordinarily understood this way, *see Doe v. State*, 943 N.W.2d 608, 610 (Iowa 2020) (where statute does not define a term, the court gives the word its ordinary meaning); *see also Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 211 (1998) (noting participation in a "program" may be voluntary or mandatory), Iowa's education laws also recognize voluntary "programs," such as a "summer reading program," *see* Iowa Code § 279.68(2)(*a*), and are express when making programs compulsory, *see* Iowa Code § 280.3(1) (a school "shall prescribe the minimum educational program"); *see also Myers v. City of Cedar Falls*, 8 N.W.3d 171, 179 (Iowa 2024) ("When the legislature selectively places language in one section and avoids it in another, we presume it did so intentionally"). Similarly so for a "promotion," when not in the employment context, the plain meaning and use of which is typically synonymous with "encourage." Add. 18, App. 544, R.Doc.

27

141 at 18; *see also Promotion*, Merriam-Webster Dictionary https://www.merriam-webster.com/dictionary/accommodation (last visited Sept. 2, 2025) (promotion as "furthering the growth or development of something"); Iowa Code § 279.66(1) (discussing policies to "promote responsible behavior on school property"). This plain meaning interpretation, however, creates major First Amendment issues when schools prohibit students from engaging in voluntary activities, such as joining student organizations or expressing themselves relating to topics of gender identity and sexual orientation. Add. 18, App. 544, R.Doc. 141 at 18.

The State does not dispute this plain meaning interpretation, which is supported by applying the whole-text canon to these terms in relation to other provisions in SF496 and their use elsewhere in Iowa's education laws. *See Doe*, 943 N.W.2d at 610 (applying "whole text" or "whole enactment" canon). Instead, the State urges "context" clarifies that "program" and "promotion" apply to mandatory compulsory functions only. Appellants' Br. at 36. The canons of construction—including *noscitur a sociis* and the title-and-heading canon—do not support the State's interpretation.

First, the *noscitur a sociis* canon does not apply because the Iowa Legislature used disparate terms with distinct meanings. Add. 20, App. 546, R.Doc. 141 at 20. There is no inherent underlying theme of obligation that runs across all seven terms in the Instruction Provision. *See* Anthony Scalia & Bryan A. Garner, *Reading Law:*

28

*The Interpretation of Legal Texts*, 166 (2012), https://jm919846758.wordpress.com/wp-content/uploads/2020/09/rlilt.pdf ("For the associated-words canon to apply, the terms must be conjoined in such a way as to indicate that they have some quality in common."). Only three of the seven relevant words in the Instruction Section carry a mandatory educational curriculum meaning ("curriculum," "test," and "instruction"). The majority of terms do not connote compulsory education. In fact, the majority of the terms carry no inherent common connotation at all, which implies the Iowa Legislature intended these terms to be read as distinct. *See Mall Real Est., L.L.C. v. City of Hamburg*, 818 N.W.2d 190, 199 (Iowa 2012) (*noscitur a sociis* canon will not apply where "its application thwarts legislative intent or makes the general words meaningless."). The district court was required to give effect to this choice. *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 288 (2010). To do so otherwise would rob each term of their "independent and ordinary significance." *Id.* (quotation omitted). The district court concluded the *noscitur a sociis* canon does not support the State's position, and the State does not seriously contest the district court's actual analysis.

Second, the State's reliance on the title-and-headings canon fares no better. The district court properly applied Iowa and Eighth Circuit case law by recognizing that "the title cannot limit the plain meaning of the text." Add. 21, App. 547, R.Doc.

29

141 at 21 (internal quotes omitted) (quoting *State v. Shorter*, 945 N.W.2d 1, 8 (Iowa 2020)). The district court also applied this Court's precedent in *Parents Defending Education*, where this Court concluded the section title cannot take priority over the "plain meaning" of the statutory language itself. Add. 21-22, App. 547–48, R.Doc. 141 at 21-22. Because the plain meanings of "program" and "promotion" are not inherently related to instruction, the title of the Instruction Section alone cannot limit their meaning. *Shorter*, 945 N.W.2d at 8; *Parents Defending Educ.*, 83 F.4th at 668-69. The State makes no attempt to argue the district court should not have followed this case law.

While an interpretation of a statute that would avoid its unconstitutionality is preferred, that interpretation must be "reasonable and readily apparent" from the text. *United Food and Commercial Workers Int'l Union*, 857 F.2d at 431 . As shown above, the State's proposed interpretation is not "reasonable and readily apparent."

The district court thus correctly concluded that the use of the terms "program" and "promotion" in the Instruction Section cannot reasonably be interpreted to apply only to compulsory portions of a school's curriculum. As the district court found, those "words are simply too broad and disconnected from mandatory classroom instruction to allow for such an interpretation." Add. 28, App. 554, R.Doc. 141 at 28.

Rather, the Instruction Provision

30

prohibit[s] school districts and teachers from doing anything within or outside the mandatory curriculum to provide programs or promotion relating to gender identity or sexual orientation to students in grade six and below. This means, among other things, the law prohibits school districts and teachers from encouraging or allowing students in those grades to join GSAs or engage in any other extracurricular activities that revolve around gender identity and/or sexual orientation.

Add. 18-19, App. 544–45, R.Doc. 141 at 18-19.

The record confirms the district court's plain meaning interpretation. School districts have prohibited or restricted GSAs altogether or prevented students in grades six and below from joining them; discouraged or prohibited the hanging of posters promoting GSAs in hallways where students in grade six and below might see them; prohibited schoolwide announcements over the loudspeakers about GSAs; ordered the removal of all LGBTQ+ visual representations (pride flags, "safe space" stickers, etc.) from places where they could be seen by students in grade six and below; and chosen not to celebrate the achievements of GSAs in the same way as other school clubs. *See* App. 56, R.Doc. 115-7, ¶¶ 24-26; App. 93, R.Doc. 115-11, ¶ 32; App. 98, R.Doc. 115-12, ¶ 11; App. 115-18 R.Doc. 115-13, ¶¶ 24, 26, 28, 30; App. 126-28, 135, R.Doc. 115-14, ¶¶ 17-18, 21, 38; App. 140-41, R.Doc. 115-15, ¶¶ 8, 12; App. 149-50, R.Doc. 115-16, ¶ 9. None of the speech restricted can be classified as "mandatory curriculum."

Appellate Case: 25-2186    Page: 41    Date Filed: 09/05/2025 Entry ID: 5554970

### 2. Restrictions on "Programs" and "Promotion" Are Facially Unconstitutional Under First Amendment.

The State's insistence that the terms "programs" and "promotion" apply only to mandatory curriculum effectively concedes that if the Instruction Section's restrictions were applied to extra-curricular matters, they would be unconstitutional.[6] That is because, as the district court found, forbidding GSAs and other noncurricular speech that revolves around transgender or nonbinary identity and gay, lesbian, or bisexual orientation, while allowing expression that revolves around cisgender identity and heterosexual orientation, is "the epitome of a viewpoint-based restriction." Add. 29, App. 555, R.Doc. 141 at 29.

When a school allows speech outside the mandatory curriculum, such as the organization of student groups or placement of displays on school walls, it creates a limited public forum for that type of speech and is obligated to maintain viewpoint neutrality in its regulation. *See Viewpoint Neutrality Now! v. Bd. of Regents of Univ. of Minn.*, 109 F.4th 1033, 1039 (8th Cir. 2024) (reservation of university building

---

[6] The State suggests in passing that "[i]t is not even clear that if the law did prohibit certain clubs, that that would be unconstitutional." Appellants' Br. at 38 (citing *Walls v. Sanders*, 2025 WL 1948450, *6 (8th Cir. July 16, 2025).) Not only did the State fail to make this argument at the district court, *see e.g. St. Paul Fire & Marine Ins. Co. v. Compaq Comput. Corp.*, 539 F.3d 809, 824 (8th Cir. 2008) (argument not raised in the district court is waived), but the State's citation does not support the State's suggestion that it would be constitutional for the Instruction Section to prohibit GSAs. *Walls* dealt with removal of materials from public school curriculum, not prohibiting school clubs.

32

space for student groups created limited public forum); *Cajune v. Indep. Sch. Dist. 194*, 105 F.4th 1070, 1083 (8th Cir. 2024) (school district allowing private persons to display posters on school walls created a limited public forum). While "gender identity" and "sexual orientation" may have carried neutral definitions, they were neither intended nor interpreted neutrally, as both parties agreed. Add. 22-23, App. 548–49, R.Doc. 141 at 22-23. After all, "boys" and "girls" sports teams remained,[7] while GSAs did not. Add. 29, App. 555, R.Doc. 141 at 29 ("Stated differently, the State Defendants cannot have it both ways. If it is 'absurd' to interpret the Gender Identity/Sexual orientation Restriction as forbidding schools from dividing sports teams or other extracurricular programs into groups based on gender identity, it means the Iowa Legislature only intended for the law to restrict speech relating to *some* types of gender identity.").

---

[7] The same Iowa Legislature that passed SF496 also passed what is now Iowa Code section 261I.2(1)(*a*)–(*b*), which requires public school sports teams be designated by gender and prohibits participation in a girls team based on the student's sex assigned at birth, thus creating a conflict if "gender identity" were interpreted neutrally. *See Brakke v. Iowa Dep't of Nat. Res.*, 897 N.W.2d 522, 538 (Iowa 2017) (under Iowa law, court may give effect "to the spirit of the law rather than the letter, especially so where adherence to the letter would result in absurdity, or injustice, or would lead to contradiction, or would defeat the plain purposes of the act"). This, especially when viewed with the legislative history and numerous statements of the bill's proponents, *see generally* App. 234-42, R.Doc. 121, ¶¶ 104-130, leaves no doubt as to the bill's target. *See also Imperial Sovereign Ct. v. Knudsen*, 699 F. Supp. 3d 1018, 1042-43 (D. Mont. 2023) (reviewing legislative history, including public statements of proponents, to assess intent to target speech based on viewpoint).

Appellate Case: 25-2186    Page: 43    Date Filed: 09/05/2025 Entry ID: 5554970

Further, this viewpoint-based restriction is now made explicit since the Iowa Legislature amended the statute to replace "gender identity" with "gender theory."[8] The surface level neutrality on gender identity has been removed. The Instruction Section now prohibits any program or promotion of speech related to the specific viewpoint of having "an internal sense of gender that is incongruent with the individual's sex as either male or female" such as the "experience[] [of] distress or discomfort with the individual's sex should identify as and live consistent with the individual's internal sense of gender." Iowa Code § 279.80(1)(a).

Even if a court determines that restrictions on gender identity and sexual orientation "program[s]" and "promotion" are content-neutral rather than viewpoint-based, these restrictions would still likely violate the Constitution's void-for-vagueness doctrine. The only way to interpret the restrictions on "program[s]" and "promotion" as non-viewpoint-based is to forbid schools from providing programs or promotion relating to *any* gender identity or *any* sexual orientation. Add. 30, App. 556, R.Doc. 141 at 30. But such a broad neutral interpretation would "mean the law bans 'girls' and 'boys' sports teams and any other classroom or extracurricular activity that recognizes and endorses gender identity." *Id.*

---

[8] The State concedes that this legislative amendment should not impact the district court's preliminary injunction order. *See* Appellants' Br. at p. 5 n. 1.

34

The State's position—that it can be trusted to apply and enforce a vague law in the intended way—would yield "absurd" results, and give it "virtually unfettered discretion to decide which speech it likes and which it does not on a particular topic." Add. 31, App. 557, R.Doc. 141 at 31. Again, *Parents Defending Education* is instructive: when the plain meaning of a restriction on speech related to a "capacious concept" is "susceptible to arbitrary enforcement," it is vague, even if the regulator assures the court it will not interpret the law so broadly. 83 F.4th at 668-69. Either the Instruction Section targets LGBTQ+ speech or it lacks any target; it is unconstitutional no matter how it is interpreted.

### 3. Unconstitutional Applications of the Instruction Section Outweigh any Constitutional Applications.

The district court properly weighed the unconstitutional applications of the Instruction Section with any constitutional applications in accordance with *NetChoice* and correctly concluded that the unconstitutional applications of the restrictions on programs or promotion relating to gender identity or sexual orientation to students in grade six and below outweigh any constitutional applications. Because other parts of the Instruction Section prohibit instruction relating to gender identity and sexual orientation as part of the mandatory curriculum, the terms "program" and "promotion" take on unique meaning only outside the mandatory curriculum. But imposing restrictions on "program[s]" or "promotion" relating to gender identity and sexual orientation outside of mandatory

35

curriculum, such as closing GSA clubs, forbidding students in grades six or below from joining GSAs, and restricting how GSAs can provide promotional materials, is inconsistent with the First Amendment. Add. 31, App. 557, R.Doc. 141 at 31. Thus, there are few, if any, constitutional applications of the Instruction Section's prohibition on "program[s]" and "promotion" and an overwhelmingly number of unconstitutional ones. The district court properly entered a narrow injunction enjoining the State from enforcing that part of the statute, and the State's arguments for reversal have no merit.

### B. The District Court Properly Enjoined the Unconstitutional Sections of the Instruction Section Consistent with the State's Position that the Instruction Section Applies Only to Mandatory Curriculum.

The State claims the district court "facially enjoin[ed] two-sevenths" of the Instruction Section and thus misapplied *NetChoice*. Appellants' Br. at 46. That characterization is misleading. The court did not strike a fraction of the statute. It enjoined the statute's application to two unconstitutional circumstances—"program" and "promotion"—after concluding those terms extended the law beyond mandatory curriculum and intruded on constitutionally protected expression. Add. 29-30, App. 555–56, R.Doc. at 29-30. The injunction was thus narrow, not broad. The State's "two-sevenths" soundbite distracts from what actually happened: the district court exercised judicial restraint and enjoined only those portions it found facially unconstitutional. Further, it ignores that the *State* is the one who demands the law be

36

interpreted to apply solely to curriculum. App. 394, R.Doc. at 9; *see also* Iowa Code § 4.12 (authorizing severance of unconstitutional provisions of laws); SF418, § 30, (in amendments of certain Iowa statutes, including the Instruction Section, authorizing severance of unconstitutional provisions as provided by Iowa Code § 4.12).

The State's "two-sevenths" framing would turn the *NetChoice* test on its head. Under its approach, legislators could draft a statute with multiple operative terms—three, five, or seven—secure in the knowledge that if only one or two of those terms are plainly unconstitutional, the law is still insulated from meaningful review because they represent a minority of the clause's words. That is not the law. *NetChoice* requires courts to weigh unconstitutional applications against constitutional ones.

The State's absurd approach cannot stand. Courts do not uphold unconstitutional speech restrictions simply because they are surrounded by other words in the same sentence. The district court did not "strike two-sevenths"; it properly identified that prohibiting any "program" or "promotion" relating to gender identity or sexual orientation creates overwhelmingly unconstitutional applications and must be enjoined. Add. 29-30, App. 555–56, R.Doc. 141 at 29-30. That is the ordinary way overbreadth analysis works, and it is faithful to *NetChoice*. The State's

"two-sevenths" argument is wrong as a matter of law and provides no basis for reversal.

### C. *Walls v. Sanders* **is Inapposite.**

The State's reliance on *Walls v. Sanders*, 144 F.4th 995 (8th Cir. 2025), is misplaced. Unlike in *Walls*, Plaintiffs-Appellees are not requesting the State provide classroom materials, a particular curriculum, instruction, or a message relating to gender identity or sexual orientation. Rather, Plaintiffs-Appellees challenge the Instruction Section and defend the district court's order enjoining its application upon the non-mandatory extracurricular aspects of public school.

*Walls* involved a state law that prohibited teachers from teaching about Critical Race Theory. The *Walls* court held that, given plaintiffs conceded classroom curriculum and instruction is government speech, restrictions imposed upon classroom curriculum and instruction are not subject to First Amendment scrutiny under the Free Speech Clause. *Id.* at 1003. The Instruction Section goes further than prohibiting *teaching* about gender identity or sexual orientation. It prohibits school districts and teachers from providing "programs" and "promotion" related to those topics, including outside of mandatory instruction. The district court was careful to limit its injunction to the restrictions in Iowa Code § 279.80(2) on any "program" or "promotion" relating to gender identity or sexual orientation because those restrictions unconstitutionally restrain speech outside the mandatory classroom

38

curriculum. Add. 35, App. 561, R.Doc. 141 at 35. The district court did not enjoin the State from prohibiting "curriculum" and "instruction" relating to gender identity and sexual orientation in elementary school. *Id. Walls* is inapplicable and does not provide a basis for reversal.

### III.   THE PRELIMINARY INJUNCTION AGAINST THE LIBRARY RESTRICTION IN *PENGUIN RANDOM HOUSE v. ROBBINS* DOES NOT RENDER PLAINTIFFS-APPELLEES' REQUEST FOR A PRELIMINARY INJUNCTION MOOT.

The district court properly addressed and granted Plaintiffs-Appellees' request for a preliminary injunction of the Library Restriction even though the district court already had enjoined enforcement of that provision in a related case, *Penguin Random House,* 774 F. Supp. 3d at1037. First, parallel injunctions are a common feature of litigation challenging the lawfulness of government action, and the one the district court granted here is consistent with precedent governing such injunctions. Second, the district court is permitted to incorporate a prior analysis or holding by reference.

"[O]verlapping injunctions" are "a common outcome of parallel litigation, rather than a reason for the Court to pass on exercising its duty to determine whether litigants are entitled to relief." *California v. Health and Human Services*, 390 F. Supp. 3d 1061, 1065-66 (N.D. Cal. 2019). Parallel injunctions are particularly appropriate where there is a risk that plaintiffs in the second case will cease to enjoy the benefit of the earlier injunction, such as where the defendants are "vigorously

39

contesting [the earlier] injunction" on appeal. *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 435 (E.D.N.Y. 2018), *vac'd in part and rev'd in part on other grounds*, *Dep't Homeland Security v. Regents of Univ. of Cal.*, 591 U.S. 1 (2020); *see also Nw. Immigrant Rights Project v. United States Citizenship and Immigration Servs.*, 496 F. Supp. 3d 31, 81 (D.D.C. 2020) (reasoning parallel injunction was appropriate, in part, because "Defendants have not committed to stand down in the parallel litigation"). Courts across the country "routinely grant" such injunctions, "even when an earlier . . . injunction has already provided plaintiffs in the later action with their desired relief." *Whitman-Walker Clinic, Inc. v. United States Dep't of Health and Human Servs.*, 485 F. Supp. 3d 1, 60 (D.D.C. 2020) (collecting cases).

This is precisely the type of case in which a parallel injunction was appropriate. By the time the district court issued its injunction in this case, the State was already "vigorously contesting" the *Penguin Random House* injunction in a related appeal, No. 25-1819. *See Batalla Vidal*, 279 F. Supp. 3d at 435. The risk of *divergent* decisions on appeal may have been small given that the appeal is pending before this same Court, but there was still a risk of the *Penguin Random House* injunction being narrowed so as not to cover Plaintiffs-Appellees here. Indeed, the State argues in the *Penguin Random House* appeal that the injunction against the Library Restriction in that case "is overbroad," and if it is upheld, it should be limited to the plaintiffs in that case. *See* Appellants' Reply Br. 31-32, *Penguin Random*

40

*House v. Robbins*, No. 25-1819 (8th Cir. filed Aug. 8, 2025). If that argument prevails, Plaintiffs-Appellees will no longer be covered by the *Penguin Random House* injunction. Only the district court's parallel injunction here will protect them from the Library Restriction. More broadly, Plaintiffs-Appellees have no control over what happens in the *Penguin Random House* case. The injunction in that case is not permanent, and plaintiffs could seek different relief at final judgment, agree to enforcement-related stipulations without Plaintiffs-Appellees' consent, or even settle the case.[9]

The only authority the State cites for its mootness argument is a vacated, unpublished order, *Iowa Migrant Movement for Justice v. Bird*, No. 24-2263, 2025 WL 319926 (8th Cir. Jan. 24, 2025), *vac'd, reh'g en banc granted*, 2025 WL 1140762 (8th Cir. Apr. 15, 2025). Aside from being nonbinding for multiple reasons, that case involved a prior injunction *already affirmed* by this Court. *See id.* at *1. At most, that case stands for the proposition that affirmance of a parallel injunction on

---

[9] Notably, in the prior appeal, which arose from a single decision simultaneously enjoining the Library Restriction in both cases, the State did not argue that granting an injunction in one case mooted the corresponding portion of the injunction in the other. On remand, the parties in the two cases argued the preliminary injunction motions at the same hearing, and the district court simply issued separate decisions on different dates. The Court should not permit the State to exploit a routine exercise of the district court's case-management discretion to deprive Plaintiffs-Appellees of assurance that an injunction in their favor will remain in place.

Appellate Case: 25-2186    Page: 51    Date Filed: 09/05/2025 Entry ID: 5554970

appeal may, in certain circumstances, moot the second injunction. But the Court has not yet affirmed the injunction in *Penguin Random House*.

The State further contends that because the district court incorporated its prior analysis by reference, it "provided no analysis," including of the *NetChoice* factors. Appellants' Br. at 51. But district courts routinely incorporate their own prior holdings by reference, particularly where the underlying material facts remain unchanged. *See, e.g., Maytag Corp. v. Int'l Union, United Auto., Aerospace & Agric. Workers Implement Workers of Am.*, No. 4:08-CV-00291-JEG, 2011 WL 3682787, at *13 (S.D. Iowa July 22, 2011). Because the district court properly engaged in a *NetChoice* analysis by incorporation, the preliminary injunction is not "unreasoned" and should not be vacated on that basis.

The district court granted a procedurally proper parallel injunction incorporating its own prior, sound reasoning by reference.[10] Accordingly, this Court should affirm that portion of the injunction.

---

[10] While the State does not engage with the Library Restriction on the merits in this appeal, such a challenge would fail. The removal of books from school libraries is not government speech. *GLBT Youth in Iowa Schools*, 114 F.4th at 667-68. The district court correctly applied *NetChoice* and concluded that the Library Restriction is unconstitutionally overbroad. *Penguin Random House*, 774 F. Supp. 3d at 1015-35. The Library Restriction would fail to satisfy even the "legitimate pedagogical concern" test of *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988), given its express purpose is to remove books already determined to support schools' educational goals. The injunction also warrants affirmance on the alternate ground that the Library Restriction's reference to "descriptions or visual depictions" is unconstitutionally vague because it fails to provide notice of what sorts of references

42

## IV. THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR PLAINTIFFS-APPELLEES.

### A. The District Court Correctly Found That Plaintiffs-Appellees Face Irreparable Harm.

The State makes no specific argument as to why the district court erred in finding Plaintiffs-Appellees faced irreparable harm, instead asserting in conclusory fashion that "Plaintiffs fail across the board" before insisting the State is who is irreparably harmed by the injunction. Appellants' Br. at 47. The State therefore waives any argument that Plaintiffs-Appellees made an insufficient showing of irreparable harm. *Federal Trade Comm'n v. Neiswonger*, 580 F.3d 769, 775 (8th Cir. 2009). Regardless, it is black-letter law that a "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Powell v. Noble*, 798 F.3d at 702 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

### B. The Balance of Equities and Public Interest Favor Plaintiffs-Appellees.

The district court acted well within its discretion in finding the balance of equities and public interest factors favor Plaintiffs-Appellees. The State argues to the contrary because the Iowa Legislature enacted SF496 and represented the "status quo" before the injunction. First, SF496 changed the status quo, and the existence of an enforcement period in between preliminary injunctions hardly constitutes

---

are covered and encourages arbitrary and discrimination enforcement. *See Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1310-11 (8th Cir. 1997).

Appellate Case: 25-2186     Page: 53     Date Filed: 09/05/2025 Entry ID: 5554970

adaptation to a new status quo. Second, it is always "in the public interest to prevent the violation of a party's constitutional rights." *D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019) (citation omitted).

*Trump v. CASA, Inc.*, 606 U.S. —, 145 S. Ct. 2540 (2025), also does not require vacatur. To start, the federal government in that case, which involved a nationwide injunction, did not argue that more geographically limited injunctions covering even a few states—much less one—would be categorically beyond federal district courts' authority, and the Supreme Court expressly declined to pass on that question. *See id.* at 2558; *see also Welty v. Dunaway*, No. 2:24-CV-768, 2025 WL 2015454, at *15 (M.D. Tenn. July 18, 2025) ("*CASA* . . . limits the availability of universal injunctions, not statewide injunctions."). Further, *CASA* merely held that the proper scope of injunctive relief is that which is "necessary to provide complete relief to each plaintiff with standing to sue." *CASA*, 145 S. Ct. at 2562–63. In the school-speech context, statewide relief is appropriate where, as here, a more limited injunction would impracticably require educational officials to alter a school's offerings *only* as to the named plaintiffs. *Cf. Jackson Fed'n of Teachers v. Fitch*, 2025 WL 2394037, at *10 (S.D. Miss. Aug. 18, 2025) (declining to narrow injunction in face of *CASA* where narrower injunction would require institutions to "craft different classes, textbooks, and curricula to accommodate named Plaintiff teachers and students" and would stymie interactions with other students). Finally,

44

the State did not argue before the district court that the injunction Plaintiffs-Appellants sought was overbroad, *see* App. 386-420, R.Doc. 128 at 1-35, and *CASA* was decided after the preliminary injunction. To the extent the Court concludes that *CASA* calls into question the relief the district court ordered, it should remand to the district court to consider application of this intervening authority in the first instance, as this Court previously did with *NetChoice* and as other appellate courts have done in cases implicating *CASA*.[11]

## CONCLUSION

For the foregoing reasons, Plaintiffs-Appellees respectfully request that the Court affirm the district court's order granting in part the preliminary injunction.

Dated September 4, 2025

Respectfully submitted,
*/s/ Thomas D. Story*

Thomas D. Story, AT0013130
Shefali Aurora, AT0012874
Rita Bettis Austen, AT0011558
AMERICAN CIVIL LIBERTIES UNION
  OF IOWA FOUNDATION
505 Fifth Avenue, Suite 808
Des Moines, IA 50309
(515) 243-3988
thomas.story@aclu-ia.org
shefali.aurora@aclu-ia.org
rita.bettis@aclu-ia.org

Laura J. Edelstein
Katherine E. Mather
JENNER & BLOCK LLP
525 Market Street, 29th Floor
San Francisco, CA 94105
(628) 267-6800
LEdelstein@jenner.com
KMather@jenner.com

---

[11] *See, e.g.*, *Rep. Comm. for Freedom of the Press v. Rokita*, — F.4th —, 2025 WL 2218472, at*8 (7th Cir. Aug. 5, 2025); *Volokh v. James*, — F.4th —, 2025 WL 2177513, at *18 n.12 (2d Cir. Aug. 1, 2025); *United States v. Texas*, 144 F.4th 632, 688 (5th Cir. 2025); *Doe v. Trump*, 142 F.4th 109, 112 (1st Cir. 2025).

Appellate Case: 25-2186    Page: 55    Date Filed: 09/05/2025 Entry ID: 5554970

Camilla B. Taylor
Kenneth D. Upton, Jr.
Nathan Maxwell*
LAMBDA LEGAL DEFENSE AND
  EDUCATION FUND, INC.
3656 N. Halsted
Chicago, IL 60613
(312) 663-4413
ctaylor@lambdalegal.org
kupton@lambdalegal.org
nmaxwell@lambdalegal.org

Karen L. Loewy
Sasha J. Buchert
LAMBDA LEGAL DEFENSE AND
  EDUCATION FUND, INC.
815 16th Street, N.W., Suite 4140
Washington, DC 20006
(202) 804-6245
kloewy@lambdalegal.org
sbuchert@lambdalegal.org

*Member of the Arizona bar.
Practicing under the supervision of a
member of the Illinois bar.

Joshua J. Armstrong
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite
900 Washington, DC 20001
(202) 639-6000
JArmstrong@jenner.com

Christopher J. Blythe
Connor S.W. Rubin
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350
CBlythe@jenner.com
Connor.Rubin@jenner.com

Karen Lou
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036-2711
(212) 891-1600
KLou@jenner.com

Appellate Case: 25-2186    Page: 56    Date Filed: 09/05/2025 Entry ID: 5554970

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i).

1. Exclusive of the exempted portions of the brief, as provided in Federal Rule of Appellate Procedure 32(f), the brief contains 10,806 words.

2. This brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font. As permitted by Federal Rule of Appellate Procedure 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

3. Pursuant to Eighth Circuit Local Rule 28A(h), undersigned counsel hereby certifies that the brief has been scanned for viruses and that the brief is virus-free.

*/s/ Thomas D. Story*
Thomas D. Story

Appellate Case: 25-2186    Page: 57    Date Filed: 09/05/2025 Entry ID: 5554970

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Thomas D. Story*
Thomas D. Story